[No. 33213. Department Two. September 8, 1955.]

A. D. MUNROE, *Respondent*, v. BEATRICE LOUISE MUNROE, *Appellant*.[1]

*G. Bradley Dalton*, for appellant.

*Wright, Booth & Beresford*, for respondent.

FINLEY, J.—In this matter, questions are raised as to the propriety of an order of the King county superior court affecting the custody of two of the five minor children of the divorced parents who are the parties litigant. The order is the result of postmarital controversies concerning custody and visitation rights. Entered on November 24, 1954, the order temporarily deprived both parents of custody and visitation rights, and placed two minor daughters in a boarding school. It provided for psychiatric observation and treatment of the children.

The mother objects to the order. She contends that she should not have been deprived of the physical custody of the two minor daughters; furthermore, that the trial court

[1]Reported in 287 P. (2d) 482.

should have deprived the father of all visitation rights and, apparently, of any so-called technical right to legal custody. On the other hand, the father sees some considerable personal advantage in the action taken by the trial court. Apparently, he is satisfied with the order. He contends that it is a proper one; that it does not involve an abuse of discretion by the trial court. In the alternative, he urges that the order is an interim one and not subject to appeal. In connection with the latter, he has moved in this court to dismiss the appeal.

We are inclined to agree with the contentions advanced by the father—first, that the action of the trial court was quite reasonable and proper, and, under the circumstances, was certainly not clearly an abuse of discretion; and second, that the order was a temporary or interim one, and that the attempt to appeal therefrom should be dismissed.

The instant legal skirmish is only one of many in a protracted battle involving both marital and postmarital difficulties of the parties. A brief background review will be helpful in understanding the nature of the present controversy.

When the parties were divorced on December 18, 1950, *each* was granted a divorce *from the other*. The decree provided that the parties would have a so-called joint legal custody of their five children (Donald, age 11, Beatrice, age 10, Bonnie, age 9, Alexander, age 7, and Harold, age 6), but gave the physical custody of the children to the mother, with liberal visitation rights to the father. Mr. Munroe was ordered to pay $375 a month for the support of the children, which he has done more or less regularly. It is significant and typical of the relationship between the parties that, prior to the entry of the decree of divorce, the court was called upon to adjust difficulties between them, when, on February 24, 1950, Mrs. Munroe moved for a show cause order to have Mr. Munroe removed from the family residence, and for an order directing him to speed up the remodeling of the house which the parties contemplated was to be awarded to Mrs. Munroe.

Prior to the divorce, on March 4, 1950, Mrs. Munroe contacted the Seattle police department and accused her husband of taking indecent liberties with the older of their two daughters, Beatrice Rose. The case was closed for lack of evidence. The police report, introduced in evidence, closed with a remark that Mrs. Munroe possibly was trying to get her husband into trouble for personal reasons.

After the divorce, there were constant disagreements between the parties, violent arguments, mutual cursing, and, allegedly, even acts of personal violence. On several occasions, Mr. Munroe came to see the children on his visitation nights, wearing a gun in a shoulder holster. Once Mrs. Munroe called the police, who took the gun away from him. There is also evidence that each of the parties tried to undermine the other's authority with the children.

Between the date of the entry of the decree of divorce and the date of the trial court hearing of the instant matter, between twenty and thirty show cause orders were initiated by the parties as to why the one or the other should not be held in contempt of court. The difficulties mainly arose out of the division of property and the visitation rights provided for in the divorce decree. The judge who heard the instant matter heard five or six of the aforementioned matters.

The events which led somewhat directly to the instant matter came to a head in the early summer of 1953. Mr. Munroe filed a motion and affidavit for an order requiring Mrs. Munroe to show cause why she should not be held in contempt of court, alleging that she willfully interfered with his rights of visitation. After a hearing, Mrs. Munroe was held in contempt. At about the same time, Mrs. Munroe secured an attorney and told him that she had found out that Mr. Munroe was taking indecent liberties with the older daughter of the parties. The attorney arranged for Mrs. Munroe to see Mrs. Kathreen Mechem, deputy prosecuting attorney for King county, who directed the morals division of the Seattle police department, to investigate the complaint. An experienced policewoman took the statement of the child, Beatrice Rose Munroe (then eight years

old), who accused her father of oral sodomy. Also, the younger daughter of the parties, Bonnie Jean, was interrogated on the same occasion. Mr. Munroe denied the charges, and both he and Mrs. Munroe voluntarily submitted to a polygraph test. At the request of Mrs. Mechem, the children were examined by Dr. S. Harvard Kaufman, director of the Psychiatric Clinic for Children at the University of Washington. After a preliminary hearing, the case was not prosecuted, primarily because of the adverse emotional influence upon the children.

In November, 1953, Mr. Munroe petitioned for modification of the divorce decree. He asked for the *physical* custody of the children. In the petition, he charged Mrs. Munroe *with perjury and subornation of perjury in that she* implanted in the minds of the children false notions of indecent liberties committed by their father, and brought false charges and accusations. The matter came up for hearing on the motion calendar in May of 1954. It was continued and put on the trial calendar. After hearing all of the evidence, the trial judge directed that the cause be continued, and, in the meantime, that the two girls be examined by a court-appointed psychiatrist. On August 6, 1954, Dr. Francis S. Bobbitt, of the Northwest Clinic of Psychiatry and Neurology, submitted a report. On November 5, 1954, the trial court rendered an oral opinion, and consistently therewith, on November 24th, entered the order now before us, which, as mentioned above, (a) deprived both parents of custody and visitation rights, (b) placed the two minor girls in a boarding school, (c) provided for further psychiatric observations and treatment of the children, and (d) ordered a further hearing on the matter at a future date.

 We have repeatedly held that in child custody cases the trial court has a broad discretion, and its determination will not be reversed except in clear cases of abuse of discretion. *Chatwood v. Chatwood,* 44 Wn. (2d) 233, 266 P. (2d) 782; *Brim v. Struthers,* 44 Wn. (2d) 833, 271 P. (2d) 441; *Hoyt v. Hoyt,* 46 Wn. (2d) 373, 281 P. (2d) 856. Furthermore, we have repeatedly said that the rights and wishes of the parents are subsidiary to the best interests

of the children. *Sweeny v. Sweeny,* 43 Wn. (2d) 542, 262 P. (2d) 207; *Saffer v. Saffer,* 42 Wn. (2d) 298, 254 P. (2d) 746.

At the hearing before the trial court, Dr. S. Harvard Kaufman testified:

"Q. And did you determine the emotional state of the child at that time? A. Yes, I did. Q. And what was her emotional state? A. My feeling was that the child was a very tense, anxious little girl who was very frightened, who had a disturbed viewpoint as to her role and her identification, who had a disturbed viewpoint of family life and as a defense or an adjustment to her anxiety was withdrawing and inhibited. Q. Do you have an opinion as to whether or not the child required further care? A. Well, at that time I said if she did not have a stable accepting environment she would probably need psychiatric help."

Mrs. Kathreen Mechem, deputy prosecuting attorney, stated that in her opinion the best way to get at the truth respecting the conflicting charges and countercharges would be to put the girls in a boarding school (away from the influence of either parent), where, after a time, they could be questioned under proper conditions. She further testified:

"Q. You recommended it, did you not, in this case? A. I believe I did. I may have written letters to that effect to both parties. I would like to—not in response to a question, if the Court doesn't have any difficulty—say that I talked to Mrs. Munroe about the advisability because of the little girl being so disturbed and I also in the presence of Mr. Munroe and to his attorney discussed the same matter, and in addition, aside from the matter of guilt or innocence as far as any criminal charge, because it was obvious that these two people propelled their arguments onto the children. It was clear from their conversations at all times that they were unable to restrain themselves from visiting their own feelings toward each other to save the children from it."

The above-mentioned report of Dr. Bobbitt reads, in part, as follows:

"In summary, from the psychiatric standpoint, the two patients Bonnie and Beatrice Munroe show evidence of maladjustment and appear to be reacting to a troubled environ-

ment. Most specific of their fears appears to be in regard to their father and their stated fear of improper advances on his part. Although they state that none of these improper advances have occurred recently, Bonnie shows evidence of considerable anxiety. The total family picture appears to be a disturbing one in which the children are caught up in the continued financial and legal battles of divorced parents.

"On the basis of my findings I believe that Bonnie Jean and Beatrice desire protection from their father. Bonnie Jean may require treatment for her emotional difficulty if it does not spontaneously clear up in the next year. And, for the children's sake, it would be most desirable if the situation could be stabilized so that there would be a minimum of open disagreement between the father and mother."

In his oral opinion, the trial judge stated there was some truth in the charges of both parties, but that they would stop at nothing to hurt each other, and this, irrespective of the best interests and welfare of their children. He emphasized the serious implications as to the children involved in the conflicting charges and countercharges and in the conflicting testimony of the parties. The trial judge clearly stated that he was unable to believe the version of the controversy as recounted by either parent. It is obvious to us that the trial court fully appreciated the gravity of the situation and had considerable doubts as to how to dispose of the matter. He was concerned about the emotional disturbance of the children and about providing some prompt and effective relief for them. He was convinced that the most likely way to get at or to determine the truth or falsity of the charges and countercharges would be through the children themselves, if they could be isolated from the influence of both parents for a period of time under proper conditions. The trial judge thereupon acted accordingly and entered the order of November 24, 1954.

If this case were to be reviewed and disposed of on the merits, we would have no hesitation whatsoever in sustaining the action of the trial court. He was faced with a most difficult and perplexing problem. His efforts were eminently sound in seeking to provide some practicable relief for the children from the intolerable situation confronting them.

His action in postponing final disposition of the matter while seeking further information through psychiatric examination of the children constituted a most reasonable effort to arrive at the truth in order to dispose of the matter properly. *Potter v. Potter,* 46 Wn. (2d) 526, 282 P. (2d) 1052. For the sake of the children, it is to be hoped that the efforts of the trial court will be, at least, somewhat successful in arriving at a proper solution of this complex and confusing marital relations problem.

In any event, we are convinced that, under the circumstances, the order of November 24, 1954, was only temporary in nature; that it was an interim one, not subject to direct appeal in the manner herein attempted. The motion to dismiss should be granted. It is so ordered.

HAMLEY, C. J., MALLERY, HILL, and ROSELLINI, JJ., concur.